**In the Matter of PRINTREE, LTD., Debtor.**

**PRINTREE, LTD., Plaintiff,**

**v.**

**TRIBUTE KNITS, INC. and Mullis, Inc., d/b/a Millpoint Storage, Defendants.**

**Bankruptcy No. 79 B 1147 (HCB).**

United States Bankruptcy Court, S.D. New York.

Sept. 10, 1984.

Lauritano & Schlacter, New York City, for debtor; Jed R. Schlacter, Jeffrey S. Kaplan, New York City, of counsel.

Lester A. Lazarus, P.C., New York City, for defendant Tribute Knits, Inc.; Lester A. Lazarus, and Harvey Friedman, New York City, of counsel.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

The debtor-plaintiff, Printree, Ltd., ("Printree") seeks damages of $67,597.20 representing lost profits plus the price paid for cloth it purchased from defendant Tribute Knits, Inc. ("Tribute") and was allegedly stored with defendant Mullis Inc., d/b/a Millpoint Storage ("Millpoint").[1] Millpoint,

---

1. The $67,597.20 total represents 17,070 pounds of greige goods purchased by Printree from Tribute at $3.20 per pound, a total of $54,624.00, plus $12,973.20 in lost profits.

having defaulted, the claim against Tribute was tried before the Court.

I

Printree purchases raw fabric from vendors, converts the fabric and resells the material to garment manufacturers. The conversion process consists of dying and/or printing and finishing the fabric. Tribute is both a converter and a vendor of raw fabric. On June 26, 1979, Printree filed a petition for reorganization under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 *et seq.* (1938) (repealed).

On September 18, 1978, Printree and Tribute entered into an agreement whereby Printree would purchase from Tribute 100,-000 yards of prepared-for-printing (P.F.P.) cloth. Pursuant thereto, Tribute was obligated to deliver the goods to finishers of Printree's designation in ten installments of approximately 10,000 yards each. Tribute completed three deliveries of P.F.P. cloth totalling 26,098 yards. On or about November 1, 1978, Printree requested that Tribute cancel the balance of the order. Tribute responded that although the mill had reported that it had already set up the machinery for the job and that therefore it was too late to cancel the order, Printree could save $.40 per pound by eliminating the prepared-for-printing step and accepting raw fabric or greige goods in place of the P.F.P. fabric.

The parties so agreed and further modified their September 1978 contract by providing that delivery be on a "bill and hold" basis whereby Tribute would store the goods until Printree provided shipping instructions. (The trade apparently measures greige goods by weight and P.F.P. fabric by length. The total quantity billed and paid for under the contract remained approximately 100,000 yards).

The remaining terms and conditions of the contract were unmodified. Among these is an exculpatory clause providing that "[m]erchandise invoiced and held at any location ... shall be at the Buyer's

risk." (Defendant's Exhibit A). Another clause states "[i]n no event shall Buyer be entitled to consequential indirect and/or special damages ... and in no instance may damages include loss or profit." *Ibid.*

Tribute billed Printree for the balance of 17,070 pounds (approximately 68,280 yards) of cloth due on the contract with a series of six invoices dated November 1, 1978, through December 11, 1979. Printree paid the full $54,624 due on these invoices, with Tribute to hold the goods pending instructions.

To fulfill its obligations under the con-. tract as modified, Tribute contracted with Borlan Industries, Inc. ("Borlan") for production of the Printree order. Borlan in turn engaged two other manufacturers, Beard Fabrics ("Beard") and Springwood Textiles, Inc. ("Springwood"). Beard shipped 4,208 pounds of these goods to Millpoint on May 2, 1979. Tribute claims that Springwood shipped the balance of the order to Millpoint in June 1979. The only documentary evidence that supports this claim consists of two letters from Borlan. The first letter, dated June 19, 1979 and addressed to Springwood, requests that Springwood ship 12,151.8 pounds of fabric to Millpoint Storage. A second letter, dated June 19, 1979, advise Millpoint to expect delivery from Springwood. The Beard and Springwood production totals 16,360 pounds or 710 pounds less than the quantity invoiced to Printree.

On the basis of these letters, Tribute informed Printree on four occasions, from June 1979 to February 1980, that its greige goods were stored at Millpoint. These letters were addressed to a Printree employee who, unknown to Tribute, has been discharged. On June 21, 1979, Tribute advised Printree that the mill no longer had the space to store the greige goods, had shipped them to Millpoint and that storage charges would ensue. The same letter notified Printree that it should "inform your insurance company for proper coverage." (Defendant's Exhibit S).[2] On June 28,

2. Tribute clearly regarded itself as a bailee at this point. Tribute admitted to the bailment

1979, Tribute forwarded to Printree a "packing record" listing 92 rolls of greige goods stored at Millpoint. On November 13, 1979, Tribute forwarded to Printree a bill for storage and freight from Millpoint. On February 1, 1980, Tribute forwarded a letter from Millpoint to Tribute threatening to auction off the goods it was holding unless storage and freight charges were paid immediately. Additionally, Millpoint billed Printree directly for storage four times from November 26, 1979 to March 3, 1980. Printree made no payments and failed to respond to these communications. Accordingly, in March 1980, Millpoint sold the goods sent to it in foreclosure of its warehouseman's lien. Thus, when Printree gave shipping instructions, Tribute was unable to deliver the goods for which Printree had paid.

None of the parties have satisfactorily explained the ultimate disposition of the 17,070 pounds of greige goods in question. Millpoint threatened to sell the goods it was holding for non-payment of storage fees in a letter to Tribute dated January 28, 1980. Thereafter, on March 22, 1980, Millpoint ran a newspaper advertisement for the sale of 92 rolls of cloth. However, the advertisement does not identify the cloth as Printree's goods or identify the cloth as Printree's goods or even as the type of cloth Printree ordered. Moreover, Jerry Mullis of Millpoint stated in a deposition that the cloth represented by the advertisement was not the cloth in dispute. (Mullis deposition p. 54) Millpoint has no records of any sales of goods.

Nevertheless, the evidence adduced at trial plainly shows that Beard manufactured 4,208 pounds of greige goods for the Printree order and that Millpoint received these goods. No such finding can be made, however, with respect to the balance of 12,862 pounds alleged to have been manufactured by Springwood. The parties have presented no proof that the goods purportedly manufactured by Springwood ever existed, were ever delivered to Millpoint Storage or were otherwise accounted for. No

bill of lading or warehouse receipt or other documents to verify that Springwood produced and delivered the fabric was produced. (Tr. 140, 141, 212, 214 and 244).

The packing list (Joint Exhibit 9) Borlan sent Tribute on June 28, 1979, listing roll numbers and corresponding weights of 92 rolls of cloth purportedly in storage at Millpoint does not cure this deficiency. It is so at variance with contemporaneous documentation that little, if any, faith can be placed in its rectitude. For example, for five of the twenty-eight rolls listed, the Borlan packing list claims a weight exceeding by 600 pounds the weight stated by Beard for the same rolls in the list it provided to Millpoint. (See Joint Exhibits 9, 13D). Moreover, the other sixty-four rolls, presumably from Springwood, are stated to weigh 12,262.8 pounds, some 111 pounds in excess of that which Borlan only two weeks before had advised Millpoint to expect from Springwood. (Exhibit 6 to Mullis deposition) More significantly, only four days before the date of the packing list, Borlan informed Millpoint that Millpoint may not have received the Springwood shipment and that future correspondence concerning these goods should be addressed to Tribute. (Joint Exhibit 13F). That Tribute failed to verify, or to require Borlan to submit verification of, the list hardly adds to its credibility, particularly here where there is no document from Springwood, like the Beard packing list sent to Millpoint, that confirms the existence of the goods.

But that conclusion, on this record, that the Springwood goods did not exist, need not rest on the inference to be drawn from lack of documentation and the inconsistencies noted above. Upon receiving the 4,208 pounds of goods produced by Beard in May 1979, Millpoint instituted a storage charge of thirty dollars per month, apparently calculated on the basis of the floor space occupied. (See Mullis deposition 11, 12, 56). Directly contradicting Tribute's claim that the Springwood goods, in an amount three times the amount of the Beard goods, were

relationship in its motion for dismissal. (Tr. 103).

sent to Millpoint in late June 1979 is the undisputed fact that the Millpoint storage charge remained at thirty dollars per month. The six invoices for storage charges Millpoint sent to Tribute and Printree indicate the same storage charge from May 1979 through March 1980. (Joint Exhibit 10A). None of these invoices refer to any goods received from Springwood.

## II

In defending against the claim for liability for failing to deliver the greige goods purchased by Printree, Tribute primarily asserts (i) that the claim is precluded by the exculpatory clause of paragraph 4 of the contract providing that "merchandise invoiced and held at any location ... shall be at Buyer's risk" and (ii) that Printree's negligence in failing to respond to Tribute's letters regarding the need to pay storage charges bars its claim. As discussed below, these defenses are tenable, but only with respect to the goods manufactured by Beard.

### A. *The Exculpatory Clause*

Since the operation of the exculpatory clause depends, by virtue of the language employed, not only on the merchandise being invoiced, but also on its being held, it necessarily contemplates that the goods actually have been manufactured and stored. On this record of evidence that contracted for goods were manufactured by Beard and sent to Millpoint for storage, it is clear that the conditions for a contractual shifting of the loss, as permitted by § 2–509(4) of the Uniform Commercial Code (UCC), N.Y.U. C.C. § 2–509(3) (McKinney's 1964), were met. The lack of probative evidence with respect to the manufacture and storage of the goods purportedly manufactured by Springwood compels a different conclusion with respect to those goods: simply put, the contractual condition to shifting the risk of loss: *i.e.*, that the goods have been manufactured, were not proven.

These conclusions would appear, moreover to comport with New York case law holding that an exculpatory clause does not, *per se*, exonerate a bailee from liability for failure to deliver. *See, ICC Metals v. Municipal Warehouse Co.*, 50 N.Y.2d 657, 409 N.E.2d 849, 431 N.Y.S.2d 372 (1980). There, a bailor deposited bars of a strategic metal with a warehouse. The warehouse receipt limited liability for loss to fifty dollars. The court concluded that proof of delivery and the warehouse's failure to return the metal established a *prima facie* case of conversion, rendering the liability-limiting clause irrelevant. In so holding, the court ruled that the burden of proof is on the bailee to show what actually happened to the goods; if a showing is made, only then will the liability limitation clause be enforceable. 50 N.Y.2d at 655, 409 N.E.2d at 851–4, 431 N.Y.S.2d at 374–7. Accord, *Employers Ins. of Wausau v. Chemical Bank*, 117 Misc.2d 601, 459 N.Y. S.2d 238, (N.Y.City Civ.Ct.1983); *see also, Real Good Food Stores, Inc. v. First National Bank of Oregon*, 276 Or. 1057, 557 P.2d 654 (1976).

In view of the strong resistance of New York authority to exonerating those who cannot explain the loss of goods they hold for others and yet permitting enforcement of an exculpatory clause if the loss is adequately explained, it would seem likely that the New York courts would apply those rules to the instant case of an initial buyer/seller relationship. To be sure, U.C.C. § 2–509, in apportioning risk of loss, absent contractual agreement, sharply distinguishes a buyer/seller relationship from that of a bailor/bailee. In the former, the seller is deemed to bear the risk of loss because it, in retaining possession, is more likely to carry appropriate insurance. J. White & R. Summers, *Uniform Commercial Code* § 5.3 (2d Ed.1980). But it is recognized that where the seller retains possession for an unusually long period of time after sale, the relationship has been conceptually transformed into that of a bailor/bailee in the sense of § 2–509(2) and risk of loss should be allocated accordingly. 3 Anderson, *Uniform Commercial Code*, 2–509:19 (2d Ed.1983); *Annot.*, 66 A.L.R.3d 1345, 154 (1975). Thus, the seller/bailee would retain the risk up until notification

of the buyer/bailor that it may take possession.

To such a transformation, Professors White and Summers, *supra,* at 185, dissent, claiming that the Code's focus on the likelihood of insurance would be distorted. Nevertheless, they concede that it could be argued that the seller, in holding the goods, could be deemed to act as the buyer's agent. *Id.* at 186.

In this regard, we think it far more appropriate to examine the relationship itself which here bears many of the earmarks of a bailment relationship under the Code. Most importantly, at issue are goods held for 17 months. That period far exceeds the two months or so that seems to be the industry custom and for which no separate storage charge is billed. This is not a case, as was contemplated before the contract was modified, where the seller is to be manufacturing goods over time to be periodically withdrawn by the buyer. In such a case it is entirely consistent with mercantile practice to expect the seller to maintain insurance. Furthermore, here the Beard goods were actually sent to a warehouse and the buyer so notified that it could take possession. The risk should shift at that point because it is no longer appropriate to cause the seller to pay insurance premiums at the buyer's discretion.

For these reasons, it appears likely that New York courts would view the relationship, at the time the loss occurred, as a bailment and apply the tests noted above. Just as the risk of loss should shift upon sending the goods to a storage facility and notification that the buyer may claim possession, so should the seller be put to the test of adequately explaining the loss under the *ICC Metals* formulation.

**3.** Tribute's liability for the loss attributable to the Springwood goods, however, does not extend to consequential damages since the contract excluded same and there is no evidence that the exclusion was unconscionable. U.C.C. § 2–719(3).

**4.** Plaintiff alleged that Millpoint failed to comply with the requirement of North Carolina law

 Since the loss of the goods manufactured by Beard has been explained, the exculpatory clause applies to those goods and Tribute should not be held accountable for their loss. But since the loss of the goods purportedly manufactured by Springwood has not been explained, the exculpatory clause cannot apply to those goods and Tribute should be held accountable for them.[3]

### B. *The Buyer's Negligence*

 This identification of the relationship of Tribute and Printree at the time of the loss, and thus the viability of the exculpatory clause with respect to the Beard goods, is also supported by New York authority that the failure of the bailor to take any action to secure his goods after the bailee had given him notice of the conditions under which his property was being held amounts to negligence. *Acme Ribbon Mills, Inc. v. New York,* 30 N.Y.S.2d 369 (Sup.Ct.N.Y.Co.), *aff'd* 266 A.D. 656, 41 N.Y.S.2d 201, *app. den.* 266 A.D. 730, 41 N.Y.S.2d 943 (1st Dept.1943). In New York, negligence of the bailor contributing proximately to the loss of a bailed item generally exonerates the bailee, *Osborn v. Cline,* 263 N.Y. 434, 189 N.E. 483 (1934), even under comparative negligence theory codified in N.Y.C.P.L.R. § 1411. (McKinney's 1984). *Schedlmayer v. Trans International Airlines,* 99 Misc.2d 478, 483, 416 N.Y.S.2d 461, 463 (N.Y.City Civ.Ct.1979).

 Here, that Printree failed to respond on at least eight occasions to notification that the Beard goods were held by Millpoint at its disposal and that storage fees were due must be deemed to have heavily and proximately contributed to the foreclosure by Millpoint on its warehouseman's lien pursuant to North Carolina law [4]

that the bailee notify the bailee of its intent to auction the goods to pay storage bills. However, Millpoint sent a letter to Tribute notifying it of plans to auction the goods if past due storage bills were not paid immediately. Tribute forwarded this letter to Printree on February 1, 1980, effectively fulfilling the North Carolina notification requirement.

for failure to pay those charges. That it had discharged the person to whom those letters were addressed is no excuse. Printree's officers claimed to have received the mail addressed to him and, even if they did not, Printree should have established procedures adequate to insure that such mail would be responded to. Conversely, Tribute cannot be said to have been negligent in continuing to send correspondence to an employee it had no reason to know had been discharged. For that separate reason, Tribute should not be accountable for the loss attributable to the Beard goods.

### III

Printree also contends that the foreclosure by Millpoint in violation of the automatic stay provided by former Rule of Bankruptcy Procedure 11–44 should be attributed to Tribute. The parties have stipulated that Tribute and Millpoint were aware of Printree's having filed for protection under the Bankruptcy laws notwithstanding Mullis' testimony of no such knowledge until after the foreclosure. Tribute's claim in its brief of no knowledge cannot be sustained.

But it can be observed that the warehouseman's lien foreclosed on represents, with the exception of the invoice for May 1979 and part of the invoiced amount for June 1979, charges arising post-petition. Furthermore, by accepting the benefits of Millpoint's storage of the goods, it appears that Printree ratified that agreement. Under the former Bankruptcy Act, an executory contract binds a debtor-in-possession if it receives benefits under it. *In re W.T. Grant Co.*, 620 F.2d 319 (2d Cir. 1980); *In re Unishops*, 553 F.2d 305 (2d Cir.1977). Printree must thus be deemed to have consented to the warehouseman's lien on the goods.

Even so, it does not appear that Printree consented to the foreclosure. Millpoint's failure to file a complaint pursuant to former Rule of Bankruptcy Procedure 11–44(d) seeking relief from the automatic stay imposed by Rule 11–44(a) prior to selling the goods violated the automatic stay. Tribute, however, should not be called upon to respond in damages for that violation. Having placed the Beard goods in Millpoint's custody, given notice to Printree that it could take possession, and advised the debtor to make the appropriate adjustments in its insurance coverage, Tribute took no action at any time after the shipment to Millpoint which was inconsistent with Printree's right to possession of the goods. Furthermore, that Millpoint began to deal directly with Printree, even to the degree of billing Printree directly for storage four times between November 26, 1979 and March 3, 1980 indicates that the onus was on Printree either to take possession of the goods or to pay the storage fees. The responsibility for Printree's failure to take either action should not be placed on Tribute, whose shipment of the Beard goods to Millpoint was clearly commercially reasonable. Printree could not justifiably expect Tribute to indefinitely bear the expense of storing and insuring the goods.

The foregoing constitutes this Court's Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

Settle Order on Notice.